**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **DONALD DEAN GOWER,** | § | |
| **Petitioner,** | § | |
| | § | |
| **V.** | § | **A-12-CA-812-SS** |
| | § | |
| **WILLIAM STEPHENS, Director,** | § | |
| **Texas Dept. of** | § | |
| **Criminal Justice-Correctional** | § | |
| **Institutions Division,**[1] | § | |
| **Respondent.** | § | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

To:     The Honorable Sam Sparks, United States District Judge

The Magistrate Judge submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. §636(b) and Rule 1(e) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrates, as amended, effective December 1, 2002.

Before the Court are Petitioner's Application for Habeas Corpus Relief under 28 U.S.C. § 2254 (Document 2); Respondent's Answer (Document 9); and Petitioner's response thereto (Document 13). Petitioner, proceeding pro se, has been granted leave to proceed in forma pauperis. For the reasons set forth below, the undersigned finds that Petitioner's application for writ of habeas corpus should be denied.

---

[1]The previous named respondent in this action was Rick Thaler. On June 1, 2013, William Stephens succeeded Thaler as Director of the Texas Department of Criminal Justice, Correctional Institutions Division. Under Rule 25(d) of the Federal Rules of Civil Procedure, Stephens is automatically substituted as a party.

## STATEMENT OF THE CASE

**A.**     **Petitioner's Criminal History**

According to Respondent, the Director has lawful and valid custody of Petitioner pursuant to a judgment and sentence of the 27th Judicial District Court of Lampasas County, Texas, in cause number 8126.  Petitioner was charged with capital murder to which he entered a plea of not guilty to the jury.  On August 28, 2008, the jury found Petitioner guilty as charged, and the trial court assessed punishment at life imprisonment.

Petitioner's conviction was affirmed by the Third Court of Appeals of Texas on November 5, 2010.  Gower v. State, No. 03-08-00570-CR, 2010 WL 4366906 (Tex. App. – Austin 2010, pet. ref'd).  The Texas Court of Criminal Appeals refused the petition for discretionary review on June 15, 2011.  Gower v. State, PDR No. 1691-10 (Tex. Crim. App. 2011).

Petitioner also challenged his conviction in a state application for habeas corpus relief. Petitioner filed his state application on February 8, 2012.  The Court of Criminal Appeals denied the application without written order on March 28, 2012.  Ex parte Gower, Appl. No. 77,237-01.

**B.**     **Factual Background**

The factual background of this case is found in the Court of Appeals opinion in Johnson v. State, No. 03-08-00448-CR, 2010 WL 2133900 (Tex. App. – Austin 2010, pet. ref'd) and is repeated below.  Chaka Romain Johnson was an accomplice of Petitioner's.  Johnson was tried separately from Petitioner and was also convicted of capital murder. The Court of Appeals in Petitioner's case relied on the factual background provided in the Johnson case, and this Court will do the same, recognizing the introduction of evidence was substantially similar at each trial.

Starting in 2005, Regina Edwards became romantically involved with Don Gower. Eventually, Edwards and Don FN1 got engaged, and Edwards moved into Don's home. In 2006, Don temporarily moved to Kansas for work purposes. After Don had been in Kansas for some time, he called Edwards and broke off their engagement. Further, he told Edwards that he had remarried his former wife Hidi. After learning that Don had remarried and that he and Hidi were moving back to Texas, Edwards moved out of the home that she and Don had shared. When Don was transferred back to Texas, he and Hidi moved into his home.

> FN1. Because Don and Hidi share the same last name, we will refer to each by their first names.

Although Edwards moved out of the home, she and Don remained friends.FN2 In March 2007, Don told Edwards that he wanted to have Hidi killed. In addition to telling Edwards, Don also mentioned his desire to have Hidi killed to his friend Jeremiah Ellison. In fact, Don offered Ellison $25,000 to kill Hidi, but Ellison turned down the offer. When Ellison refused, Don asked Ellison if he knew anyone who would be willing to do the job. Around that same time, John Martinez contacted Ellison to see if Ellison would sell him some cocaine. Because Ellison knew that Don was selling cocaine, he arranged a meeting between Don and Martinez. After Martinez purchased drugs from Don, Don offered Martinez $25,000 to kill Hidi. Don explained that the money would come from a life-insurance policy that he had taken out on Hidi.

> FN2. In her testimony, Edwards denied continuing a romantic relationship with Don after he remarried Hidi, but the testimony from other witnesses and various exhibits indicate that they were romantically involved during the months leading up to Hidi's death.

When he formulated a plan for killing Hidi, Don originally considered having Hidi killed in the parking lot where she worked. Don mentioned the parking-lot idea to Edwards and stated that he did not think that there were any video cameras in the lot, but Edwards said, "There's cameras everywhere." After Don told Martinez about the parking-lot idea, Martinez drove to Hidi's work to see if that plan could work, but he concluded that the parking lot was not a good location because there were always people in the parking lot when Hidi finished work.

After Martinez rejected Don's first suggestion, Don formulated a different plan. Specifically, Don thought that the killer should hide in Hidi's car and then wait for an opportune moment to kill Hidi. In furtherance of that plan, Don took a set of Hidi's car keys and gave them to Ellison so that Ellison could give the keys to Martinez. Ellison told Martinez that Don had given him the keys to the car, and Ellison placed the keys outside the front entryway to his apartment so that Martinez

could pick them up without entering the apartment. Late that same evening, Martinez drove to Ellison's apartment and picked up the keys. Some time after getting the keys, Martinez placed them in his girlfriend's purse. Martinez's girlfriend's name was Mariah Epperson.

In March 2007, Martinez told Ellison that he needed to get money from Don in order to buy a gun. After Martinez mentioned needing a gun, Ellison attempted to locate a gun to purchase, but he was unsuccessful. Because Ellison was unsuccessful, Martinez made arrangements to purchase a gun. When Martinez went to buy the gun at the agreed location, Ellison accompanied him, and Don and Edwards drove there separately. Don paid $250 for the gun, but Martinez kept the gun. The individual who sold the gun wrapped the gun in a towel and also gave Martinez some ammunition.

A few weeks before July 2007, Ellison moved out of his apartment, and he and his girlfriend moved into Don and Hidi's home. Some time after Ellison moved in, Don came up with a new plan for killing Hidi. Don decided that the best time to kill Hidi would be on July 4 at the local VFW where he and Hidi had planned to play pool that night. Essentially, Don planned to park his truck in the back of the parking lot and then ask Hidi to retrieve something from the truck around the time that the fireworks were starting to go off. Don wanted the murderer to wait for Hidi at the truck and hoped that the sounds of the shots would be muffled by the fireworks.

On July 2, 2007, Don and Ellison went to Martinez's hotel room, and Don told Martinez that he had to either return the gun or the money that was used to purchase the gun. Martinez said that he would return the gun but had to wait until the next day because the gun was at his girlfriend's house. Ellison returned to Martinez's hotel room the next day in order to retrieve the gun and told Martinez about the new plan. At that time, Don was frustrated with Martinez because he had not made any attempt to kill Hidi. For that reason, Don had renewed his prior request to Ellison that Ellison be the one to kill Hidi, but Ellison still did not want to. Because Ellison did not want to shoot Hidi, Martinez offered to help find an individual who would agree to do the job, but he and Ellison were unable to find anyone willing to go through with it.

A few days before Ellison went to Martinez's hotel room, Edwards received a phone call from Johnson (appellant). Johnson and Edwards had been involved in an on-again, off-again romantic relationship before she started dating Don in 2005. The relationship had lasted for years, but it ended when Johnson was sent to prison. Shortly after Johnson was released, he called Edwards and asked her to come pick him up, and she brought him to her house. While Johnson was staying with her, Edwards became romantically involved with Johnson again. In addition to knowing Edwards, Johnson was also friends with Ellison and called Ellison when he was

released from prison. In the days leading up to July 4, Johnson and Ellison spent a lot of time together.

On July 4, Ellison went to Edwards's home to socialize with Johnson. Johnson had also invited another friend named Fred Mosby. At some point during the day, Johnson, Ellison, and Mosby left Edwards's home to meet up with Martinez at his hotel room. Eventually, the four of them got into Martinez's girlfriend's (Epperson's) car and drove around the VFW. After finishing their drive, the four went to Edwards's home. Edwards had planned on going to see the fireworks show, but shortly before the show started (approximately 8:00), Johnson, Ellison, and Martinez left Edwards's home again and drove off in Epperson's car. After leaving Edwards's home, Johnson and Martinez drove to Don's home and dropped Ellison off. While Johnson and Martinez were dropping Ellison off, Mosby and Edwards went to watch the fireworks show.

Around the same time that Johnson and the others left Edwards's home, Don was driving Hidi to the VFW. After playing pool for a little while, Don asked Hidi to retrieve something from his truck on two separate occasions. Hidi did not return after heading out to the truck for the second time. After noticing Hidi's long absence, several of the individuals inside the VFW expressed concern for Hidi. Don attempted to deflect their concerns by saying that Hidi was "probably on her phone." Eventually, another patron at the VFW insisted on going outside to check on Hidi, and Don begrudgingly agreed to accompany him. The patron found Hidi lying beside Don's truck. She had been shot several times, including a couple of shots to the head. One of the individuals inside the VFW called 911, and emergency personnel responded. Hidi was taken to the hospital but died shortly after arriving.

After the fireworks show concluded, Edwards and Mosby returned to her home. Martinez dropped Johnson off at Edward's home shortly after Edwards got back from the show. On July 5 (the day after the shooting), Johnson, Mosby, Martinez, and Epperson all met up at Edwards's house to watch movies.

During his investigation of the death of Hidi, Texas Ranger Jesus Ramos had several conversations with Edwards. In one of those conversations, Edwards confessed to knowing about the plan to kill Hidi and identified several people who had been involved in the crime. After obtaining the names of the individuals potentially involved, the police went to Epperson's work to look for Martinez. The police saw Martinez drive up in Epperson's car, informed Epperson that her car might have been used during the commission of a crime, and asked for permission to search her car. Epperson agreed, and the police searched her car. The police found a gun wrapped in a towel and ammunition inside the trunk. Tests performed on the gun linked the gun to the discharged ammunition that was used in the crime.FN3

FN3. A set of keys to Hidi's car were found in Epperson's purse. Epperson told the police that Martinez put the keys in her purse and told her to not worry about them when she asked whose they were.

Ultimately, the police arrested Martinez, Johnson, Don, and Ellison. After the police concluded their investigation, Johnson was charged with capital murder. See Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(3). Specifically, the indictment alleged that Johnson "intentionally or knowingly" caused the death of Hidi "for remuneration or the promise of remuneration from" Don.FN4

FN4. The language of the indictment tracks the language found in the penal code provisions defining murder and capital murder. See Tex. Penal Code Ann. § 19.02(b)(1) (West 2003), § 19.03(a)(3) (West Supp. 2009).

During Johnson's trial, Edwards, Martinez, Ellison, Epperson, Mosby, Ranger Ramos, witnesses who were at the VFW on July 4, two of Johnson's friends, and Edwards's landlord all testified. The jury charge instructed the jury that Ellison and Martinez were accomplices to the crime as a matter of law but left it to the jury to determine whether Edwards was an accomplice to the crime. The jury found Johnson guilty, and the district court imposed a life sentence on Johnson.

Johnson v. State, No. 03-08-00448-CR, 2010 WL 2133900 (Tex. App. – Austin 2010, no pet.).

Similar to Johnson, Petitioner was charged with capital murder and Edwards, Martinez, Ellison, Ranger Ramos, and witnesses at that VFW on July 4 testified at his trial. Ramos testified that while at the crime scene on July 5, he observed Petitioner slowly drive by with a passenger lowered into the vehicle, so that only the top of her head was visible. 6 SF 78. Ramos testified he waved at Petitioner to come over, but Petitioner turned his head and mashed the gas. 6 SF 78. Ramos stated he and other investigators hopped in their vehicles to track Petitioner down. 6 SF 79. Although they drove fast, they were unable to catch him. 6 SF 79.

Edwards clarified the remarriage of Petitioner to Hidi. Edwards testified that she met Petitioner in December 2004 and moved in with him in June 2005. 7 SF 90. They were subsequently engaged. 7 SF 90. Petitioner went to Kansas on T.D.Y. (temporary duty) in March 2006. 7 SF 71.

That month Petitioner called Edwards from Kansas and told her he was going to marry someone else and Edwards and her children needed to move out of the house.  7 SF 92.  Petitioner married Hidi in Kansas and later returned to Texas.  7 SF 93.  Approximately three months later, Petitioner told Edwards he was going to divorce Hidi.  7 SF 94.  Hidi moved out of Petitioner's house, and Edwards moved back in.  7 SF 95.  Edwards explained moving in together was for financial reasons, and they never resumed an intimate relationship.  7 SF 95, 98.  A short time after Edwards moved back in, Petitioner remarried Hidi in November 2006, and Edwards moved out.  7 SF 96.

Edwards also added that Johnson returned to her house shortly after she did on July 4th, wearing a different shirt than what he was wearing when he previously left Edwards's house, and his pants were dirty.  7 SF 132-133.  When asked about the conditions of his clothing, Johnson told Edwards it was none of her business.  7 SF 135.  The following day Edwards sent a text to Petitioner, asking how he and Hidi played in their pool tournament the night before.  7 SF 142.  Petitioner responded Hidi won 2 out of 3, but he did not win his.  7 SF 142-143.  He also told Edwards that Hidi had been jumped or robbed.  7 SF 144.  Edwards asked what hospital Hidi was in.  7 SF 144.  Petitioner responded "Scott White," and then said, "Now in Dallas."  7 SF 144.  Edwards asked if Hidi would be okay and questioned his remark about Dallas.  7 SF 144.  Petitioner responded "Autopsy." 7 SF 145.  Shortly thereafter, a news report came on the television regarding the murder.  7 SF 147.  Edwards asked Johnson whether he was involved in the killing.  7 SF 150.  Johnson responded, "shit happens" and he needed the money.  7 SF 150.  That same night Edwards also overheard Ellison telling Johnson, "[Petitioner] doesn't know I didn't do it."  7 SF 139.

Martinez testified at trial that the money for the killing would come from an insurance policy. 7 SF 230. He stated that the original fee had been $25,000, but the fee was reduced to $10,000 due to problems with the life insurance policy. 7 SF 281.

Ellison similarly testified Petitioner had originally offered him $25,000 to commit the crime. 8 SF 77. The payment dropped from $25,000 to $10,000, because Hidi had lost her job and the life insurance that went with it. 8 SF 82. Petitioner assured Ellison he still had insurance through the military. 8 SF 83. Ellison admitted his involvement in getting money for the gun, getting the keys to Hidi's car, giving clothes to Johnson to wear during the shooting, and giving Johnson and Martinez a picture of Hidi, so they could identify her. 8 SF 194-195.

In addition to the witnesses named above, Trooper Monty Carroll, Ashley Edwards, Sergeant Gerrine Lizama, and Wayne Ploeckelmann also testified. Trooper Monty Carroll, a trooper with the Texas Department of Public Safety, was the first witness called to testify in the trial against Petitioner. Carroll testified he was the first law enforcement officer at the scene of the shooting. 6 SF 25. Carroll described Petitioner as somewhat calm or acting as a disinterested third party. 6 SF 41.

Edwards's teenage daughter, Ashley, confirmed Edwards's testimony that in March 2007 Petitioner met Ellison in the parking lot and transferred something to him in an envelope. 7 SF 209. She assumed the envelope contained money. 7 SF 211.

Sergeant Gerrine Lizama testified Petitioner and Hidi came to his human resources office at Ft. Hood in March 2007 to update forms, which included life insurance. 9 SF 17. The amount of the policy for Hidi was $100,000. 9 SF 19. Lizama recalled Petitioner and his daughter returned to

his office the morning of July 5, 2007, asking about an emergency leave form and when the life insurance money would be paid.  9 SF 26-27.

Wayne Ploeckelmann, Hidi's supervisor at Alltel, testified Hidi's employment was terminated June 27 or 28, 2007.  8 SF 251.  At the time of her employment, Alltel provided her a $50,000 life insurance policy.  8 SF 250.  Policy benefits expire on the end of the month from when employment terminated.  8 SF 251.  Petitioner went to Ploeckelmann's office on July 5, 2007, to inform him Hidi had been killed and inquire as to whether Hidi had been terminated or whether she quit.  8 SF 252.

Similar to Johnson's case, the jury charge instructed the jury that Ellison and Martinez were accomplices to the crime as a matter of law but left it to the jury to determine whether Edwards was an accomplice to the crime. The jury found Petitioner guilty, and the district court imposed a life sentence.

**C.      Petitioner's Grounds for Relief**

Petitioner raises the following grounds for relief:

1.      The trial court erred when the court proceeded to trial without a hearing to determine Petitioner's competency to stand trial;

2.      He was denied effective assistance of counsel on appeal;

3.      He was denied his right to an impartial jury;

4.      He was denied his right to a jury of his peers;

5.      There was insufficient evidence to support his conviction; and

6.      He was denied effective assistance of counsel at trial.

**D.      Exhaustion of State Court Remedies**

Respondent does not contest that Petitioner has exhausted his state court remedies regarding the claims brought in this application.  A review of the state court records submitted by Respondent shows that Petitioner has properly raised these claims in previous state court proceedings.

<u>DISCUSSION AND ANALYSIS</u>

**A.      The Antiterrorism and Effective Death Penalty Act of 1996**

The Supreme Court recently had the opportunity to summarize the basic principles that have grown out of the Court's many cases interpreting the 1996 Antiterrorism and Effective Death Penalty Act.  <u>See</u> <u>Harrington v. Richter</u>, – U.S. –, 131 S. Ct. 770, 783-85 (2011).  The Court noted that the starting point for any federal court in reviewing a state conviction is 28 U.S.C. § 2254, which states in part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The Court noted that "[b]y its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." <u>Harrington</u>, 131 S. Ct. at 784.

10

One of the issues <u>Harrington</u> resolved was "whether § 2254(d) applies when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied." <u>Id.</u>  Following all of the Courts of Appeals' decisions on this question, <u>Harrington</u> concluded that the deference due a state court decision under § 2554(d) "does not require that there be an opinion from the state court explaining the state court's reasoning."  <u>Id.</u> (citations omitted).  The Court noted that it had previously concluded that "a state court need not cite nor even be aware of our cases under § 2254(d)."  <u>Id.</u> (citing <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002) (per curiam)).  When there is no explanation with a state court decision, the habeas petitioner's burden is to show there was "no reasonable basis for the state court to deny relief."  <u>Id.</u>  And even when a state court fails to state which of the elements in a multi-part claim it found insufficient, deference is still due to that decision, because "§ 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." <u>Id.</u>

As <u>Harrington</u> noted, § 2254(d) permits the granting of federal habeas relief in only three circumstances: (1) when the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of the Supreme Court; (2) when the earlier decision "involved an unreasonable application of" such law; or (3) when the decision "was based on an unreasonable determination of the facts" in light of the record before the state court.  <u>Id.</u> at 785 (citing 28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523 (2000)).  The "contrary to" requirement "refers to the holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision."  <u>Dowthitt v. Johnson</u>, 230 F.3d 733, 740 (5th Cir. 2000) (quotation and citation omitted).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.

Id. at 740-41 (quotation and citation omitted).   Under the "unreasonable application" clause of § 2254(d)(1), a federal court may grant the writ "if the state court identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."   Id. at 741 (quotation and citation omitted).   The provisions of § 2254(d)(2), which allow the granting of federal habeas relief when the state court made an "unreasonable determination of the facts," are limited by the terms of the next section of the statute, § 2254(e).   That section states that a federal court must presume state court fact determinations to be correct, though a petitioner can rebut that presumption by clear and convincing evidence.   See 28 U.S.C. § 2254(e)(1).   But absent such  a showing, the federal court must give deference to the state court's fact findings.   Id.

## B.    Competency Claim

In his first ground for relief, Petitioner argues the trial court erred when the court failed to conduct a hearing before determining his competency to stand trial had been restored after he previously had been deemed incompetent for trial.   The record reflects defense counsel filed a "Motion Suggesting Incompetency and Request for Examination" on December 7, 2007.  Supp. Rec. at 1-3. That same day, the trial court ordered an evaluation.   Id. at 4.  On January 16, 2008, after Petitioner's initial evaluation, the parties agreed Petitioner was incompetent to stand trial.   Id. Accordingly, the trial court ordered Petitioner committed to the Vernon State Hospital for a period not to exceed 120 days for further examination and treatment toward the specific objective of

attaining competency to stand trial.  Id. at 5-6.  On February 25, 2008, Dr. Joseph Black, Chief Psychiatrist of the Competency Program at the Vernon State Hospital,  notified the state trial court that Petitioner had been evaluated and was competent to stand trial.  Attached to Black's letter is a five-page report detailing Petitioner's psychological evaluation and finding Petitioner competent to stand trial.  Id. at 7-12.  Petitioner was returned to Lampasas County to stand trial.  The state trial court did not conduct a hearing to determine Petitioner's competency after he was returned from the state hospital.  Instead, the trial court made a retrospective determination of competency by reciting in the judgment that Petitioner had regained competency before trial.

On direct appeal, Petitioner challenged the trial court's failure to hold a competency hearing before trial.  The state appellate court noted Petitioner did not cite, and the court did not find, any legal authority requiring the trial court to conduct a hearing to determine competency after a defendant had previously been found incompetent.  Gower v. State, No. 03-08-00570-CR, 2010 WL 4366906, at *2 n.4 (Tex. App. – Austin 2010, pet. ref'd). Upon review of the letter and report which were provided to the appellate court in a supplemental record, the appellate court determined the retrospective determination of competency recited in the judgment was sufficient.   The state appellate court explained "[o]nce a defendant is found to be incompetent, however, he is presumed to be incompetent until it has been lawfully determined that he is competent to stand trial."  Id. at *2 (quoting Schaffer v. State, 583 S.W.2d 627, 630 (Tex. Crim. App. 1979)).  The appellate court found that Dr. Black's letter was sent to the trial court months before trial began.  Id.  The letter notified the trial court that Petitioner had been evaluated and deemed competent to stand trial.  Id. After considering Petitioner's claim, the appellate court determined the language in the trial court's judgment indicated that the trial court properly made a determination of competency after

defendant's return from the state hospital and before the trial court proceeded with trial.  In rejecting

Petitioner's claim, the appellate court found the trial court's determination was supported by the

letter from the state-hospital superintendent deeming Petitioner competent to stand trial.  Id.

Petitioner also raised this claim in his state application for habeas corpus relief.  The state

habeas court found:

> The competency matter was resolved against [Petitioner] by supplemental
> clerk's record containing a letter addressed to the trial court from Dr. Joseph L.
> Black, the superintendent of the state hospital where [Petitioner] resided.  With the
> letter, finding [Petitioner] had regained competency, and the recitation contained in
> the Court's Judgment, the Third Court found that the issue of competency had been
> determined to be restored affirming the trial Court's Judgment.

Ex parte Gower, No. 77,237-01 at 26.

A defendant has a procedural due process right to a competency hearing when the evidence

raises a bona fide doubt as to the defendant's competence at the time of trial and any immediately

related proceedings.  Pate v. Robinson, 383 U.S. 375, 385 (1966); McInerney v. Puckett, 919 F.2d

350, 351 (5th Cir. 1990).  Three factors should be considered when determining whether a "bona fide

doubt" exists: the existence of any history of irrational behavior, defendant's demeanor at trial, and

prior medical opinion.  Chenault v. Stynchcombe, 546 F.2d 1191, 1193 (5th Cir. 1977) (citing Drope

v. Missouri, 420 U.S. 162, 180 (1975)); Mata v. Johnson, 210 F.3d 324, 329 (5th Cir. 2000).

There is no evidence in Petitioner's case that raises a bona fide doubt as to his competency

at the time of trial.  The record does not reflect defense counsel or the trial court had any concerns

regarding Petitioner's competency at the time of trial.  Petitioner has not shown that there was

anything before the trial court that might have alerted it to the need to inquire into Petitioner's

competency after having received a thorough and detailed report from Dr. Black verifying

Petitioner's competence.  Having independently reviewed the entire state court record, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence.

## C.    Ineffective Assistance of Appellate Counsel

In his next ground for relief, Petitioner argues he received ineffective assistance of appellate counsel.  Petitioner asserts his first appellate lawyer filed an Anders[2] brief that was not accepted by the appellate court.  Specifically, the appellate court reviewed the record and determined the issue regarding whether the trial court made the appropriate competency finding was not frivolous.  New appellate counsel was appointed to address whether the trial court made a judicial determination of competency before proceeding to trial.  Petitioner contends his second appellate counsel was ineffective for only addressing the competency issue and suggests counsel should have reviewed the whole case.  However, he does not indicate what additional points of error his appellate counsel should have raised.

A criminal defendant has a constitutional right to the effective assistance of counsel at trial and on a first appeal as of right. U.S. Const. amend. VI, XIV; Evitts v. Lucey, 469 U.S. 387, 393–95, (1985); Strickland v. Washington, 466 U.S. 668, 688 (1984); Anders v. California, 386 U.S. 738, 744 (1967).  An ineffective assistance claim is governed by the familiar standard set forth in Strickland v. Washington, 466 U.S. at 668. See also Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001) (applying the Strickland standard to ineffective assistance claims against appellate counsel). To establish ineffective assistance of counsel Petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient

---

[2]  Anders v. California, 386 U.S. 738 (1967).

performance the result of the proceeding would have been different.  Strickland, 466 U.S. at 688.
To show prejudice, a petitioner must show that, but for appellate counsel's performance, there is a
reasonable probability he would have prevailed on appeal.  Smith v. Robbins, 528 U.S. 259, 285,
(2000).

Having independently reviewed the entire state court record, this Court finds nothing
unreasonable in the state court's application of clearly established federal law or in the state court's
determination of facts in light of the evidence.  Petitioner did not identify any issue, let alone any
meritorious issue, he believed counsel should have raised on appeal.  He simply argued counsel
should have "review[ed] [the] entire case as required."  In addition, the Court has reviewed the full
record of the case, and does not find any issue which, if raised on appeal, would have resulted in the
reasonable probability of Petitioner prevailing on appeal.

**D.     Impartial Jury**

Petitioner next argues he was denied the right to an impartial jury.  According to Petitioner,
the local newspaper in his rural community ran stories saying Petitioner was a "hitman out of
Detroit" and "was trained to kill in the military."  Petitioner claims "the whole jury pool
acknowledged they had heard about the case." According to Petitioner "there was a motion submitted
and denied for change of venue."

Contrary to Petitioner's assertion, there is no record a motion to change venue was ever filed
in his case.  In addition, Petitioner has provided the Court with no evidence supporting his statements
regarding the newspaper articles.  Moreover, Petitioner has failed to demonstrate actual prejudice
infected the jury.

16

During voir dire, only one of the prospective jurors indicated that they had talked to anybody close to the case, such as law enforcement, investigators, people who worked at the VFW, or witnesses. 5 SF 36. That juror, number 10, admitted he could not be fair. Juror 27 indicated he had received information from a person and knew more than the average person about the case but indicated he could give a fair and impartial verdict. 5 SF 39. Juror 50 indicated he had heard information about the case from a friend who frequents the VFW. 5 SF 40. However, he stated he believed he could put it out of his mind and be bound by the evidence at trial. 5 SF 41. Juror 58 indicated he lives near the VFW and knows people who work at the VFW. 5 SF 42. Juror 58 was unsure he could put the gossip aside and base his verdict on the witnesses at trial. 5 SF 43. Juror 23 indicated his father was in the active military and he preferred not to be put in the position of a juror in a trial against a military person. 5 SF 44.

When questioned by defense counsel, Jurors 5, 12, 15, 20, 21, 33, 35 and 58 admitted they had heard about Petitioner's case on the television. 5 SF 58. Jurors 5, 6, 7, 8, 10, 12, 13, 14, 15, 16, 18, 21, 27, 28 and 40 admitted they had heard about the case in the paper. 5 SF 58. None of these jurors indicated that the reports on the television or newspaper caused them to formulate in their own minds any impressions, attitudes or beliefs about the case. 5 SF 58. Jurors 4, 5, 8, 10, 32 were excused for cause. 5 SF 64-67. The State struck jurors 3, 6, 12, 14, 15, 16, 17, 21, 23 and 30. CR at 72. The defense struck jurors 6, 7, 11, 12, 13, 14, 16, 22, 24, and 27. CR at 73. Of the twelve jurors selected only jurors 20 and 33 had heard about the case on the television and jurors 18 and 28 had heard about the case in the newspaper. 5 SF 68.

In Skilling v. United States, 130 S. Ct. 2896, 2914–15 (2010), the Supreme Court of the United States reviewed prior precedent regarding the change of venue in criminal matters due to

17

pre-trial publicity, and found that there is a presumption of prejudice in "only the extreme case" where the conviction was "obtained in a trial atmosphere that was utterly corrupted by press coverage." The Court also stated that when there is no presumption of prejudice, the defendant may prove that "actual prejudice infected [the] jury." Id. at 2917. Prior to the Skilling ruling, the United States Court of Appeals for the Fifth Circuit applied an actual prejudice standard to pre-trial publicity claims brought in habeas corpus petitions. "As a general rule, a state defendant who seeks habeas relief as a result of pretrial publicity must demonstrate an actual, identifiable prejudice on the part of members of the jury that is attributable to that publicity." Moore v. Johnson, 225 F.3d 495, 504 (5th Cir. 2000) (quoting Willie v. Maggio, 737 F.2d 1372, 1386 (5th Cir. 1984)).

There is no evidence the pretrial publicity was pervasive in this case or that any of the selected jurors were prejudiced by any publicity. Having independently reviewed the entire state court record, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence. Accordingly, Petitioner's claim does not warrant federal habeas relief.

**E.    Jury of Peers**

Petitioner further claims he was denied a jury of his peers. Petitioner explains at the time of trial he was active duty Army Infantry with over twenty years of service. Petitioner claims there "was a motion to have him tried by a jury of his peers, I.E. military and that was denied." Petitioner contends civilians are not his peers. He claims the jury was not qualified to make an assessment of his competence to stand trial. He believes this is what the "court had the jury do."

Contrary to Petitioner's statement, the court, not the jury, determined Petitioner was competent to stand trial. In addition, there is nothing in the record to suggest a motion was filed

18

requesting a military trial. Finally, when presented with this claim in his state habeas application, the trial court noted Petitioner had recited his extensive military career but found Petitioner failed to "support this argument with any degree of proof that the complained of error contributed to his conviction." Ex parte Gower, Appl. No. 77,237-01 at 26.

Having independently reviewed the entire state court record, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). While the Sixth Amendment ensures that the defendant's peers in the community will serve as the ultimate arbiters of his fate, the Constitution does not require the jury consist of only military personnel when an active member of the service is tried in state court for capital murder. Nor does the Constitution give Petitioner the right to insist on being tried in a military court. Accordingly, Petitioner's claim does not warrant federal habeas relief.

F.     **Sufficiency of the Evidence**

Petitioner next claims that once his co-conspirator's testimony is removed, the evidence is insufficient to support his conviction. As mentioned above, only federal constitutional claims are cognizable in a federal habeas proceeding. Estelle, 502 U.S. at 67-68. "[T]he Constitution imposes no requirement that the testimony of an accomplice-witness be corroborated by independent evidence. Accordingly, the prosecution's failure to satisfy the requirements of the accomplice-witness sufficiency rule, and a state court's failure to enforce that purely state rule,

simply [does] not warrant constitutional attention." Brown v. Collins, 937 F.2d 175, 182 n. 12 (5th Cir. 1991).

Federal habeas review of a claim based on the sufficiency of the evidence is extremely limited.   A federal court may not disturb a conviction in a state criminal proceeding unless no rational trier of fact could have found the elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); Gibson v. Collins, 947 F.2d 780, 781 (5th Cir. 1991). The evidence must be viewed in the light most favorable to the verdict.  Jackson, 443 U.S. at 319; Gibson, 947 F.2d at 781.  This standard of review applies in both direct and circumstantial evidence cases.  Schrader v. Whitley, 904 F.2d 282, 287 (5th Cir. 1990).  Federal courts are bound by state statutes and case law in determining the elements of an offense.  Foy v. Donnelly, 959 F.2d 1307, 1313 (5th Cir. 1992).  Petitioner was charged with capital murder.  Under Texas law, a person commits murder if he intentionally or knowingly causes the death of an individual.  Murder becomes capital murder when a person employs another to commit the murder for remuneration or the promise of remuneration.  TEX. PENAL CODE ANN. §§ 19.02(b)(1) & 19.03(a)(3) (West 2006).

 Petitioner challenged the sufficiency of the evidence in his state application for habeas corpus relief.  The Texas Court of Criminal Appeals denied the application and rejected Petitioner's claim.  Having independently reviewed the entire state court record, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence.  As detailed above in the factual background, the evidence is more than sufficient to support Petitioner's conviction when viewing the evidence in the light most favorable to the verdict.  Accordingly, Petitioner's claim does not warrant federal habeas relief.

**G.      Ineffective Assistance of Trial Counsel**

In his final ground for relief, Petitioner contends he received ineffective assistance of trial

counsel because:

> Counsel did not do a complete job of bringing my mental stability into view of the
> court.  He did not express my training to the court.  The military installs into its
> soldiers never to show your enemy where you are vulnerable.  I was addicted to
> multiple pain and mood altering medication[s] due to injuries received while on
> active duty military, for the prior 20+ years.  I had went through 8 operations in the
> prior 2.5 years, the latest was 2.5 months prior to my arrest.  Also during my trial
> there was military specific testimony about insurance, my personal bearing, and
> disposition that my lawyer did not cross examine and explain the difference between
> civilian wifes [sic] involvment [sic] with there [sic] husband work and a military
> spouce [sic].  Due to the state of mind during the trial, I never said a word on the
> stand or 2 [sic] help my lawyer and he did not question me on these subjects.  I just
> thought that since I had not done what they accused me of it would be all good.  I
> trusted my lawyer to look out for my best interest.  Regina Edwards was a suspect
> and they dropped charges against her and used her as a witness.  The weapon that was
> found had female DNA and the police did not try to type match it to Regina Edwards
> (shooters fiancé) or John Martinez's girlfriend who owned the car where the gun was
> found and was driving it when the police started the investigation.

Ineffective assistance of counsel claims are analyzed under the well-settled standard set forth

in Strickland v. Washington, 466 U.S. 668 (1984):

> First, the defendant must show that counsel's performance was deficient.  This
> requires showing that counsel made errors so serious that counsel was not
> functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.
> Second, the defendant must show that the deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so serious as to deprive the
> defendant of a fair trial, a trial whose result is reliable.  Unless a defendant can make
> both showings, it cannot be said that the conviction or death sentence resulted from
> a breakdown in the adversary process that renders the result unreliable.

Id. at 687.  In deciding whether counsel's performance was deficient, the Court applies a standard

of objective reasonableness, keeping in mind that judicial scrutiny of counsel's performance must

be highly deferential.  Id. at 686-689.  "A fair assessment of attorney performance requires that every

21

effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689.  "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (Citation omitted).  Ultimately, the focus of inquiry must be on the fundamental fairness of the proceedings whose result is being challenged. Id. at 695-97.  Accordingly, in order to prevail on a claim of ineffective assistance of counsel, a convicted defendant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 687, 104 S. Ct. at 2064.  "Mere conclusory statements do not raise a constitutional issue in a habeas case." Schlang v. Heard, 691 F.2d 796, 799 (5th Cir. 1982).

Contrary to Petitioner's claim, his competency issue was resolved against Petitioner after Petitioner had been evaluated by a doctor and the trial court made a retrospective finding that Petitioner was competent to stand trial.  As explained previously, defense counsel filed a "Motion Suggesting Incompetency and Request for Examination" on December 7, 2007.  Supp. Rec. at 1-3. After Petitioner's initial evaluation, the parties agreed Petitioner was incompetent to stand trial. Id. Petitioner was committed to the Vernon State Hospital for further examination and treatment. Id. at 5-6.  On February 25, 2008, Dr. Black notified the state trial court that Petitioner had been evaluated and was competent to stand trial.  Petitioner was returned to Lampasas County, and trial began in August 2008.

22

The record simply does not reflect defense counsel or the trial court had any concerns regarding Petitioner's competency after he was returned from the Vernon State Hospital.  Petitioner has not shown that there was anything before the trial court or his defense attorneys that might have alerted them to the need to inquire into Petitioner's competency before trial started.   Indeed, Petitioner has not presented the state court or this Court any evidence to suggest Petitioner was incompetent at the time of trial.  As such, Petitioner has failed to show counsel was deficient with regard to the issue of competency or that Petitioner suffered prejudice thereby.

Petitioner's remaining claims of ineffective assistance also fail.  Although Petitioner claims counsel did not "express [his military] training to the court," Petitioner appeared every day for trial in his uniform and testimony was introduced regarding Petitioner's military background and injuries he sustained while in the military.  Petitioner further claims "there was military specific testimony about insurance, [his] personal bearing, and disposition that [his] lawyer did not cross examine and explain the difference between military deployment preparation and readiness, and difference between civilian wifes [sic] involvment [sic] with their [sic] husband [sic] work and a military spouce [sic]." However, the record reflects counsel thoroughly cross-examined the witnesses introduced at trial and aggressively challenged the state's case presented against Petitioner.  Although counsel did not cross examine witnesses with respect to military deployment and readiness and the difference between civilian and military wives, such testimony would have been wholly irrelevant to Petitioner's defense.  None of the evidence Petitioner suggests should have been raised would have rebutted the overwhelming evidence that he employed another to commit the murder of his wife for the promise of remuneration and would not have affected the outcome of trial.

Petitioner raised his ineffective assistance of counsel claim in his state habeas application. The Court of Criminal Appeals rejected the claim when it denied Petitioner's application. Having independently reviewed the entire state court record, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence. Petitioner has failed to show counsel was deficient in any manner when defending Petitioner. Moreover, the overwhelmingly evidence of Petitioner's guilt precludes a finding of prejudice in this case. Accordingly, the Court is of the opinion that 28 U.S.C. § 2254, as amended by the AEDPA, bars habeas corpus relief on Petitioner's claim that he received ineffective assistance of trial counsel.

## RECOMMENDATION

It is recommended that Petitioner's application for writ of habeas corpus be denied.

## CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, effective December 1, 2009, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in Slack v. McDaniel, 529 U.S. 473, 484, 120 S. Ct. 1595 (2000). In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that

24

reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Id. "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id.

In this case, reasonable jurists could not debate the dismissal or denial of the Petitioner's section 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. Miller-El v. Cockrell, 537 U.S. 322, 327, 123 S. Ct. 1029 (2003) (citing Slack, 529 U.S. at 484). Accordingly, it is respectfully recommended that the Court shall not issue a certificate of appealability.

## OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. Battles v. United States Parole Comm'n, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the

district court. <u>See</u> 28 U.S.C. § 636(b)(1)(c); <u>Thomas v. Arn</u>, 474 U.S. 140, 150-153, 106 S. Ct. 466, 472-74 (1985); <u>Douglass v. United Servs. Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en banc</u>).

To the extent that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 29th day of August, 2013.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE